UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
LUIS PEREZ,

                Petitioner,                            **MEMORANDUM & ORDER**

       v.                                               No. 21-CV-3061 (RPK)

J. JOHNSON, *Superintendent*,

                Respondent.
-----------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

       Petitioner Luis Perez is serving a life sentence after being convicted of second-degree murder in New York state court. The state appellate court affirmed his conviction on direct appeal. Petitioner now seeks a writ of habeas corpus under 28 U.S.C. § 2254, pointing to two state-court actions that he says denied him his constitutional right to a fair trial. Petitioner acknowledges that his petition was not filed within the one-year statute of limitations set out in 28 U.S.C. § 2244(d)(1), but he asks the Court to equitably toll the limitations period in view of the COVID-19 pandemic. As explained below, petitioner has not demonstrated an entitlement to equitable tolling, and the petition is therefore dismissed as untimely. In any event, on the merits, petitioner's claims are unavailing.

**BACKGROUND**

**I.   Factual Background**

       Petitioner was charged with the second-degree murder of Bruce Blackwood in March of 2006. *See* Aff. in Opp'n to Pet. for Writ of Habeas Corpus ¶¶ 5–6 (Dkt. #7) ("Warden's Aff."). The following facts are taken from the state court record, viewed in the light most favorable to the prosecution. *See McDaniel v. Brown*, 558 U.S. 120, 133 (2010).

       Sometime in 2004 or 2005, Mr. Blackwood hired petitioner to help renovate a property he owned in Brooklyn—983 Hancock Street. *See, e.g.*, Tr. 116:8–17; 397:6–17 (Dkt. ##7-4–8).

1

While working on the renovations, petitioner stayed in a third-floor apartment at 983 Hancock. *See id.* at 399:3–9. Petitioner hired two people to help him with the work: Martin Rodriguez and Irene Michaux. *See id.* at 398:6–25 (Mr. Rodriguez); 131:20–137:16 (Ms. Michaux).

Throughout 2005 and early 2006, petitioner frequently expressed frustration and anger with Mr. Blackwood. Petitioner complained to a contractor, Milton Taylor, that Mr. Blackwood was "not paying [petitioner] for this or that," and once suggested that he was "going to hurt [Mr. Blackwood]." *Id.* at 193:21–194:25. On another occasion, after Mr. Blackwood hired someone other than petitioner to perform work on a different property, petitioner "got really angry about it," "kicked [a mirror] and broke it," and then told Mr. Rodriguez that "he was going to kill [Mr. Blackwood]." *Id.* at 404:23–406:3. Specifically, petitioner told Mr. Rodriguez that "he was going to tie [Mr. Blackwood] up in a chair, and he was going to put tape on him, take his [PIN] numbers, all the numbers from his cards, [and] torture him." *Id.* at 406:4–8. Mr. Rodriguez testified that petitioner mentioned this plan to him "a few times," indicating "that Mr. Blackwood had lots of money . . . [and] that [petitioner] was going to do everything to get money from him." *Id.* at 412:22–413:9. Petitioner asked Mr. Rodriguez if he was "down with" this plan, meaning was he "willing to help [petitioner] to get rid of Mr. Blackwood." *Id.* at 413:7–15. And petitioner told Mr. Rodriguez that he planned to "cut [Mr. Blackwood] up in pieces and dispose of him in plastic bags," and that "they won't ever find out." *Id.* at 413:16–414:1. At some point, petitioner also asked Mr. Rodriguez "to go to the hardware store and get . . . gray tape." *Id.* at 414:2–8.

On March 1, 2006, Mr. Blackwood made a report at his bank indicating that he believed several checks had been forged. *Id.* at 335:7–21. He filled out and signed forgery affidavits relating to thirteen checks—twelve of which were endorsed to petitioner and one of which was endorsed to Mr. Rodriguez. *Id.* at 269:2–270:5. Thereafter, Mr. Blackwood spoke to his friend Diane Mason-Smith, and told her "he was upset because he had found out . . . that [petitioner] had

2

. . . taken checks out of [Mr. Blackwood's] house," and that he planned to confront petitioner and "ask him to leave his property, to get out." *Id.* at 99:16–102:3. Petitioner's counsel repeatedly objected to Ms. Mason-Smith's recounting of Mr. Blackwood's hearsay statements, but the state court overruled the objections. *See ibid.*

On March 6, Ms. Mason-Smith called Mr. Blackwood on both his cell phone and his home phone. *See id.* at 102:13–25. Mr. Blackwood did not answer either call, and his cell phone "went right to voice mail," which Ms. Mason-Smith saw as "unusual" because "[h]e never turned off his phone." *Ibid.* The next day, Ms. Mason-Smith made various phone calls to try to locate Mr. Blackwood—to his employer, a mutual friend, Mr. Blackwood's brother, and a tenant who lived at 983 Hancock—but none had seen Mr. Blackwood. *See id.* at 103:2–104:16. Ms. Mason-Smith then drove to the Hancock Street property with a friend, where they saw Mr. Blackwood's car parked outside and then saw petitioner "g[et] into [Mr. Blackwood's] car and start[] to drive." *Id.* at 104:20–106:9. The pair followed petitioner, who at some point "stopped the car on [a] one-way street and got out and came to the back of the car and stared at [them]." *Id.* at 106:6–21. Ms. Mason-Smith and her friend drove away, and eventually called the police, reported Mr. Blackwood missing, and informed them that he "was having problems with [petitioner]" prior to his disappearance. *Id.* at 107:5–18.

A few days later, on March 8, petitioner arranged for Ms. Michaux to move into one of the apartments at 983 Hancock. *See id.* at 218:16–19. Ms. Michaux was receiving housing assistance, so her rent checks were issued by the city. *See id.* at 217:1–10. The city made the checks out to Mr. Blackwood and delivered them to a real estate broker; the broker gave the checks to petitioner, who said he was "in charge of the building" and asked "if he could have the[] checks issued to his name." *Id.* at 219:18–220:17. Shortly after Ms. Michaux moved into the apartment, petitioner told her that the police had been to the house because "[Mr. Blackwood] is gone and he's not

3

coming back." *Id.* at 157:1–4. Petitioner then told Ms. Michaux that he was going to "work on [Mr. Blackwood's] body" and told her not to "say anything" and that if she did, "he w[ould] com[e] after [her] and [her] family." *Id.* at 157:5–9. The next day, Ms. Michaux saw petitioner wearing latex hospital gloves and putting pieces of a metal saw in a garbage bag; petitioner again told her "not [to] say anything or he [was] going to come after [her]." *Id.* at 159:4–25.

In July 2011, petitioner's daughter, Irene Perez, went to the police precinct and told a detective named Wendell Stradford that her father—petitioner—had confessed to her that he killed Mr. Blackwood. *See id.* at 671:11–25. Petitioner's counsel objected to Detective Stradford's testimony to this effect on hearsay grounds, but the court overruled the objection. *See ibid.* After their initial conversation, Ms. Perez contacted the detective again and told him that she had recorded petitioner confessing to the crime, but the initial recording was of "very poor" quality, so the detective asked her whether she would be willing to make another recording using a device provided by the police. *See id.* at 672:24–673:22. On August 1 and August 3, 2011, Ms. Perez recorded petitioner confessing to Mr. Blackwood's murder. *See id.* at 673:24–675:16. The State played portions of both recordings for the jury. *See id.* at 568:8–23 (August 3 recording); 573:15–574:7 (August 1 recording). Petitioner's counsel did not object to the admissibility of the recordings on audibility grounds.

The jury convicted petitioner of second-degree murder. *See id.* at 816:16–19.

## II. Procedural Background

### A. *Direct Appeal*

Petitioner appealed his conviction, raising three arguments: (1) that he was deprived of his right to a fair trial by the admission of the two recordings made by Ms. Perez, which petitioner argued were of such poor quality as to be virtually inaudible; (2) that his trial counsel's failure to object to the recordings on that basis constituted ineffective assistance of counsel; and (3) that he

4

was denied a fair trial by the admission of two hearsay statements—Detective Stradford's recounting of Ms. Perez's statements inculpating petitioner and Ms. Mason-Smith's recounting of Mr. Blackwood's statements about petitioner.  *See* Pet.'s App. Br. 23–35 (Dkt. #7–9).

The appellate division affirmed petitioner's conviction.  *See People v. Perez*, 84 N.Y.S.3d 811 (App. Div. 2018).  The court held that petitioner's due-process claim regarding the audio recordings was unpreserved for appellate review and failed in any event because while "background noise made some portions of the recordings inaudible, the remainder was sufficiently clear to permit the jury to understand the contents without resorting to speculation." *Id.* at 812.  It followed from that latter conclusion that petitioner's ineffective-assistance claim relating to his trial counsel's failure to object to the audio recording's quality was "without merit."  *Ibid.*  As for petitioner's hearsay challenges, the court held that, "[t]o the extent that the admission of [Detective Stradford's] testimony was improper . . . it did not deprive [petitioner] of his constitutional right to a fair trial" because "there was overwhelming evidence of [petitioner's] guilt, and no significant probability that the errors contributed to [his] conviction." *Ibid.*  And the court held that petitioner's challenge to Ms. Mason-Smith's testimony was "without merit." *Ibid.*

B. *Section 2254 Petition*

The New York Court of Appeals denied leave to appeal on February 25, 2019, *see People v. Perez*, 122 N.E.3d 1116 (N.Y. 2019), and petitioner neither sought collateral relief in state court nor petitioned for certiorari in the United States Supreme Court, *see* Pet. 9.  Accordingly, petitioner's time for seeking direct review expired on May 26, 2019—ninety days after the Court of Appeals denied leave to appeal.  *See Saunders v. Senkowski,* 587 F.3d 543, 548–49 (2d Cir. 2009).  Petitioner then had one year—until May 26, 2020—to file his Section 2254 petition.

Petitioner filed his habeas petition, raising the same claims presented in his direct appeal, nearly a year after that date, on May 16, 2021.  *See* Aff. of Service 1 (ECF Pagination) (Dkt. #1-

2) (stating that the petition was placed into the prison mailbox on May 16, 2021). In his petition, petitioner acknowledged that his application was untimely. *See* Pet. 21. He pointed to several causes for the delay: (1) his lack of knowledge of the law and lack of legal representation; (2) the fact that he did not "have much access to the law library"; and (3) the fact that he was misinformed and mistakenly believed that federal courts were closed due to the COVID-19 pandemic. *Ibid.* (capitalization altered). He also stated that he "wrote to the United State[s] Court requesting permission to grant [him] an extension to file [his] habeas corpus and they did." *Ibid.* (capitalization altered). He attached to his petition a letter addressed to the United States District Court for the Eastern District of New York—dated after the one-year filing period had already expired—"ask[ing] the court to . . . grant [him] equitable tolling on [his] deadline to file [his] writ of habeas corpus." Aff. of Service 3–5 (capitalization altered). The petition states that he is enclosing a copy of a letter "from the United State[s] Court," *see* Pet. 22, but petitioner did not attach any Court order or correspondence.

I ordered petitioner to show cause why his petition should not be dismissed as untimely. *See* Mem. & Order dated June 24, 2021 (Dkt. #4) ("Show Cause Order"). The Show Cause Order observed that "[p]etitioner's filings to date have not established that equitable tolling is warranted," explaining that petitioner's claim that he "d[id] not have adequate legal education and ha[d] had limited access to the law library" was not a valid basis for equitable tolling and that "petitioner ha[d] not provided sufficient information to allow the Court to determine whether equitable tolling [wa]s warranted" based on "disruptions caused by the coronavirus pandemic." *Id.* at 4. I accordingly directed petitioner to file a letter "indicat[ing] what steps he took to prepare his petition before the limitations period expired on May 26, 2020" and "describ[ing], in greater detail, what disruptions prevented him from filing his petition by that date." *Ibid.*

Petitioner filed a response. *See* Pet.'s Aff. in Resp. to Show Cause Order (Dkt. #5) ("Pet.'s Aff."). Petitioner argued that even though ignorance of the law and limited access to the law library, standing alone, "were not extraordinary circumstances warranting equitable tolling," tolling was appropriate "when you combine [those factors] with the extraordinary circumstances of a Global pandemic." *Id.* at 1. Specifically, petitioner stated that, at the start of the pandemic, "everyone was told that the courts were closed due to the pandemic," and that it in any event it was impossible to think about the statute of limitations because "[t]he only thing that a prisoner was thinking about was if [he] was going to die today." *Id.* at 1–2. Petitioner asserted that the conditions in prison "got so bad . . . that we were being fed in our cells," that "[w]e didn't have contact with anybody from the outside world for over 6 months," and that "[o]ur prison libraries were closed or ran at partial capacity and are still r[u]n at partial capacit[y]." *Id.* at 2. Finally, petitioner stated that, "at the height of the pandemic . . . the last thing anybody was thinking about was going to a place like the prison law library where there was a possibility you could be infected and die." *Ibid.*

## DISCUSSION

The petition is dismissed as time-barred. In any event, petitioner's claims would fail on their merits.

### I. Petitioner Is Not Entitled to Equitable Tolling

The petition is untimely because it was filed outside AEDPA's statute of limitations and petitioner has not established that equitable tolling is warranted.

AEDPA's one-year statute of limitations may be equitably tolled "only in 'rare and exceptional circumstances.'" *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (quoting *Baldayaque v. United States*, 338 F.3d 145, 151 (2d Cir. 2003)); *see Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001). To succeed on a claim for equitable tolling, "a petitioner [must]

7

demonstrate[] '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Harper*, 648 F.3d at 136 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)) (citation and quotation marks omitted). The first prong requires a petitioner to "show diligent pursuit of his claim '*throughout the period he seeks to toll.*'" *Id.* at 139 (quoting *Belot v. Burge*, 490 F.3d 201, 205 (2d Cir. 2007)) (emphasis in *Harper*). As for the second prong, a petitioner must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000). The two prongs are related: extraordinary circumstances cannot be said to have "prevented timely filing," *Holland*, 560 U.S. at 649, "if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances," *Valverde*, 224 F.3d at 134.

Applying these principles, petitioner is not entitled to equitable tolling because he has not shown that extraordinary circumstances related to the COVID-19 pandemic prevented timely filing of his petition. Petitioner's application was notarized on May 13, 2021, *see* Pet. 23—nearly twelve months after the expiration of AEDPA's one-year limitations period. To justify his failure to file over that lengthy period, petitioner states that he was "misinformed" that "due to the corona virus all courts were closed." Pet. 21; *see* Pet.'s Aff. 2. But "a *pro se* [petitioner's] misapprehension of the law regarding the statute of limitations does not constitute 'extraordinary or unusual circumstances' preventing him from filing a timely petition." *Hickey v. Senkowski*, No. 02-CV-1437 (DC), 2003 WL 255319, at *4 (S.D.N.Y. Feb. 4, 2003) (quoting *Valverde*, 224 F.3d at 133); *see Rodriguez v. Bennett*, No. 97-CV-5953 (JSR) (MHD), 1998 WL 104604, at *1 (S.D.N.Y. Mar. 9, 1998) (*pro se* litigant's lack of notice of AEDPA's limitations period did not justify tolling). In response to the Court's order to show cause, petitioner also states that prison law libraries "were closed or ran at partial capacity" during the pandemic, and "still r[u]n at partial capacities." Pet.'s

8

Aff. 2. But petitioner has not suggested that he was entirely without library access throughout the period he seeks to toll, and "restricted access to library facilities," by itself, is not an extraordinary circumstance. *Caraballo v. United States*, No. 10-CR-392-6 (CS), 2021 WL 1062036, at *3 (S.D.N.Y. Mar. 19, 2021); *see Warren v. Kelly*, 207 F. Supp. 2d 6, 10 (E.D.N.Y. 2002).

Moreover, petitioner has not shown diligence during the nearly yearlong period that he seeks to toll. Even those litigants who did face extraordinary circumstances relevant to tolling due to the pandemic must "show what efforts, if any, [they] took to contend with the extraordinary circumstances caused by the pandemic" in order to receive equitable tolling. *Morales v. People*, No. 21-CV-2783 (EK), 2021 WL 6125598, at *2 (E.D.N.Y. Dec. 28, 2021). Courts deny requests for equitable tolling when petitioners do not make that showing. *See, e.g.*, *ibid.* ("[Petitioner] has not sufficiently demonstrated that he both confronted extraordinary circumstances and exercised reasonable diligence in filing his petition despite those circumstances. For example, he focuses on his unsuccessful attempts to retain an attorney during the pandemic . . . but does not explain what measures he took to file his petition without counsel."); *Mairs v. Fields*, No. 20-CV-1451 (EK), 2021 WL 4311140, at *2 (E.D.N.Y. Sep. 22, 2021) ("Petitioner's motion falters on reasonable diligence grounds, because he says literally nothing about any actions he undertook or attempted in order to advance his petition in the period he seeks to have tolled.").

Petitioner has not demonstrated diligence over the period between May 2020 and May 2021. While petitioner describes the impacts of the COVID-19 pandemic in his facility— such as limited access to the law library and fears about the threat the virus posed to the prison population—he does not describe "any actions he undertook or attempted in order to advance his petition" in the face of those challenges. *Mairs*, 2021 WL 4311140, at *2 (explaining that while petitioner's "concern [about the spread of COVID-19 in prison] is understandable, . . . courts still require some showing of effort"). He does not claim that he was diligently attempting to prepare

9

his habeas application in that time, and he does not identify any steps that he took to do so. Indeed, it is hard to see how this petition could have been delayed for nearly a year due to obstacles such as limited law library access, because the petition contains no legal citations "that would have required lengthy library access prior to submission," but instead merely "restate[s] the claims that he raised in his post-conviction briefs" almost verbatim. *Id.* at *3; *compare* Pet. 11–17, *with* Pet.'s App. Br. 23–35. In sum, even if petitioner faced extraordinary circumstances due to the COVID-19 pandemic, petitioner's failure to describe any step he took toward preparing his application during the relevant period means "the link of causation between the extraordinary circumstances and the failure to file is broken," and equitable tolling is not warranted. *Valverde*, 224 F.3d at 134.

Accordingly, petitioner is not entitled to equitable tolling. His petition is untimely.

## II. Petitioner's Claims Also Lack Merit

In any event, even if the Court were to consider petitioner's due-process-based claims on the merits, petitioner would not be entitled to relief.

A federal court may grant federal habeas relief only if the state court's decision rejecting the petitioner's claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *Williams v. Taylor*, 529 U.S. 362, 407 (2000), meaning there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This standard is "intentionally difficult to meet," *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citing *White v. Woodall*, 572 U.S.

10

415, 418 (2014)) (quotation marks omitted), because federal habeas review is "a 'guard against extreme malfunctions in the state criminal justice systems,'" not "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Richter*, 562 U.S. at 102–03).

None of petitioner's claims clear that high bar.

A. *Audio Recording Claims*

Petitioner first asserts that he was deprived of his due process right to a fair trial when the State introduced two audio recordings of petitioner that he claims were of such poor quality as to be virtually inaudible, permitting the State to misrepresent petitioner's statements in the recordings. *See* Pet. 3. He also contends that he was denied the effective assistance of counsel when his defense attorney failed to object to the admissibility of the audio recordings on this basis. *See id.* at 4. Neither argument is persuasive.

Plaintiff's due-process claim relating to the admission of the audio recording fails because the appellate division rejected it as unpreserved for appellate review, *see Perez*, 84 N.Y.S.3d at 812; N.Y. Crim. Proc. Law § 470.05(2))—an independent and adequate state-law ground for rejecting petitioner's claim. *See, e.g.*, *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007) ("[T]he procedural bar of § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division's holding."); *McPherson v. Keyser*, No. 20-161-PR, 2021 WL 4452078, at *2 (2d Cir. Sept. 29, 2021) ("The New York courts' application of their rules regarding the preservation of legal issues for appellate review in criminal cases—codified at N.Y. Crim. Proc. Law § 470.05[2]—constitute[s] independent and adequate state grounds for their rejection of [petitioner's] insufficiency claim."), *cert. denied*, 142 S. Ct. 1235 (2022); *see also Medina v. Gonyea*, 111 F. Supp. 3d 225, 233 (E.D.N.Y. 2015) (collecting cases). That is true even though the appellate division, in the alternative, rejected petitioner's due process claim on the merits. *See Perez*, 84 N.Y.S.3d at 812; *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (holding that a

11

state court's finding that petitioner's "claims were not preserved for appellate review" under N.Y. Crim. Proc. Law § 470.05(2) "barred [the court] from reaching the merits of his . . . federal claims . . . even where the state court has also ruled in the alternative on the merits of the federal claim[s].") (discussing *Harris v. Reed*, 489 U.S. 255 (1989)).

In any event, petitioner's claim that the admission of the audio recording violated his right to a fair trial is without merit. Under New York law, an audio recording that is otherwise relevant and admissible must be excluded only "if it is so inaudible and indistinct that a jury must speculate as to its contents"; "so long as the conversations can be generally understood by the jury," any instances of partial inaudibility "go to the weight of the evidence and not to its admissibility." *People v. McCaw*, 27 N.Y.S.3d 574, 577 (App. Div. 2016). Even assuming that the audio recording was of such poor quality as to require exclusion under that standard, the Supreme Court has suggested that Section 2254 relief based upon an erroneous state-court evidentiary ruling is appropriate only if the improperly admitted evidence "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (citing *Lisenba v. California*, 314 U.S. 219, 228 (1941)). Meeting that standard requires showing that the challenged evidence, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *see Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012). When a record is replete with other "highly probative evidence," it stands to reason that a disputed item "neither provided the basis for [the defendant's] conviction nor removed a reasonable doubt that would have existed without it." *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992).

Petitioner cannot establish that any evidentiary error in admitting the purportedly inaudible recordings "so infused [his] trial with unfairness as to deny [him] due process of law" given the

12

ample other evidence that supported the jury's verdict. *Estelle*, 502 U.S. at 75. Mr. Taylor testified that petitioner said he was "going to hurt [Mr. Blackwood]" for "not paying him." Tr. 193:21–194:25. Mr. Rodriguez testified that petitioner repeatedly told him that he was planning on killing Mr. Blackwood, and detailed a plan whereby he would tie Mr. Blackwood to a chair, "torture him," kill him, and then "get rid of [him]" by "cut[ting] him up in pieces and dispos[ing] of him in plastic bags" so that no one would "ever find out." *Id.* at 413:3–414:1. Similarly, Ms. Michaux testified that petitioner told her that Mr. Blackwood was "gone and he's not coming back" and that he was going to "work on [Mr. Blackwood's] body," that she later saw him disposing of a saw, and that petitioner told her that if he told anyone what she had seen he would "come after [her] and [her] family." *Id.* at 157:1–159:25. Lastly, Ms. Mason-Smith testified that she saw petitioner driving Mr. Blackwood's car after his disappearance. *See id.* at 106:6–21. In view of this wealth of evidence against petitioner, it cannot be said that the audio-recorded confession was so "crucial, critical, [and] highly significant" to the State's case as to have "provide[d] the basis for [petitioner's] conviction." *Collins*, 755 F.2d at 19 (citation omitted).

Petitioner fares no better in his argument that his trial counsel's failure to object to the recording violated his Sixth Amendment right to the effective assistance of counsel. The appellate division rejected this claim as "without merit," *Perez*, 84 N.Y.S.3d at 812, and that conclusion did not reflect an unreasonable application of clearly established federal law. To establish an ineffective-assistance claim, a petitioner must show that (1) his "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Because, as just discussed, the State's evidence against petitioner was strong enough to sustain a conviction even without the audio recording, petitioner necessarily fails to demonstrate *Strickland* prejudice.

### B. *Hearsay Claims*

Nor would petitioner be entitled to relief based on the trial court's admission of certain hearsay statements. Petitioner takes issue with two pieces of testimony: (1) Detective Stradford's testimony that petitioner's daughter told him that petitioner had confessed to her, *see* Tr. 671:13–23; and (2) Ms. Mason-Smith's testimony that Mr. Blackwood had told her that "he was upset because he had found out . . . that [petitioner] had . . . taken checks out of [Mr. Blackwood's] house" and that "[h]e was going to go and ask [petitioner] to leave his property," *id.* at 99:25–100:6, 102:2–3. Neither statement warrants relief.

At the outset, petitioner has never claimed—either in state court or in this Court—that the admission of these statements ran afoul of his Sixth Amendment right to confront the witnesses against him. Instead, he argues only in terms of his due-process right to a fair trial. For substantially the same reasons just given, *see* pp. 12–14, *supra*, petitioner is unable to demonstrate that the admission of either statement, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins*, 755 F.2d at 19.

Accordingly, the appellate division did not violate clearly established federal law when it affirmed the trial court's admission of these statements into evidence.

## CONCLUSION

For the foregoing reasons, the petition is dismissed as untimely. Where, as here, a district court dismisses a habeas petition on procedural grounds without reaching the constitutional merits, a certificate of appealability will only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner has not made either showing here, so no certificate

of appealability shall issue.  In addition, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purposes of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

    The Clerk of Court is directed to enter judgment and close the case.

    SO ORDERED.

                                       */s/ Rachel Kovner*
                                       RACHEL P. KOVNER
                                       United States District Judge

Dated: July 7, 2023
       Brooklyn, New York